*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0320P (6th Cir.)
File Name: 03a0320p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

RICHARD M. FRAZIER,
*Petitioner-Appellant,*

*v.*

No. 01-3122

STEPHEN J. HUFFMAN,
Warden,
*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 98-02098—James G. Carr, District Judge.

Argued: October 15, 2002

Decided and Filed: September 8, 2003

Before: BATCHELDER, CLAY, and GILMAN, Circuit
Judges.

—————————

## COUNSEL

**ARGUED:** John B. Nalbandian, TAFT, STETTINIUS &
HOLLISTER LLP, Cincinnati, Ohio, for Appellant. Michael
L. Collyer, OFFICE OF THE ATTORNEY GENERAL OF
OHIO, Cleveland, Ohio, for Appellee. **ON BRIEF:** John B.

Nalbandian, Daniel F. Oberklein, James V. Schuster, TAFT,
STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, David
Paul Bradley, GALLAGHER, SHARP, FULTON &
NORMAN, Cleveland, Ohio, for Appellant. Michael L.
Collyer, OFFICE OF THE ATTORNEY GENERAL OF
OHIO, Cleveland, Ohio, Henry G. Appel, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for
Appellee.

GILMAN, J., delivered the opinion of the court, in which
CLAY, J., joined. BATCHELDER, J. (pp. 34-42), delivered
a separate opinion concurring in part and dissenting in part.

—————————

## OPINION

—————————

RONALD LEE GILMAN, Circuit Judge. Tiffany Skiba
was stabbed to death on November 8, 1990. The grand jury
in Cuyahoga County, Ohio indicted Richard M. Frazier on
two counts of aggravated murder for the death of Skiba, each
with three death-penalty specifications, and on one count of
aggravated burglary. Frazier proceeded to trial in state court
on August 5, 1991. The jury convicted him on all counts and
subsequently recommended that he be sentenced to death.
That recommendation was adopted by the trial judge.

After exhausting his direct appeals and state postconviction
remedies, Frazier sought a writ of habeas corpus in federal
court pursuant to 28 U.S.C. § 2254. He raised multiple
grounds for relief, but primarily focused on claims of
evidentiary error, prosecutorial misconduct, and ineffective
assistance of counsel. The district court denied Frazier's
petition, but granted him a certificate of appealability on all
issues. For the reasons set forth below, we **REVERSE** in
part the judgment of the district court, **GRANT** Frazier a
conditional writ of habeas corpus that will result in the
vacation of his death sentence unless the state of Ohio

commences a new penalty-phase trial against him within 180 days from the date that the judgment in this matter becomes final, and **REMAND** the case for further proceedings consistent herewith**.**

## I. BACKGROUND

### A. Factual background

Frazier married Susan Bednarski in 1980, thereby becoming the stepfather of Bednarski's eight-year-old daughter from a previous relationship, Tiffany Skiba. In February of 1988, Bednarski discovered that Skiba was pregnant. Both women believed that Skiba's pregnancy was the result of sexual abuse by Frazier. Bednarski sought a divorce. Skiba spoke to the local authorities in Medina County, Ohio. In October of 1988, Frazier was indicted in state court on two counts of rape and two counts involving other sex crimes. One month earlier Skiba had given birth to a son.

The state criminal court ordered Frazier to submit to a blood test to determine the paternity of Skiba's child. He appealed that order to the intermediate state appellate court and to the Ohio Supreme Court. After the Ohio Supreme Court denied Frazier relief, he petitioned the United States Supreme Court for a writ of certiorari. Frazier remained free on bond during the pendency of these proceedings. The United States Supreme Court declined to hear Frazier's case on October 1, 1990. Dates for the blood test and the trial were then set by the state criminal court.

Throughout 1989 and 1990, Skiba was terrified of Frazier. She was visibly disturbed any time that she was in his presence. Skiba confided in one friend her fear that Frazier was going to kill her. She moved into her grandparents' home and started sleeping with a knife under her pillow.

Skiba's grandfather, Robert Skiba, followed his usual practice on November 8, 1990 when, at 5:00 a.m., he drove his wife to work at a nearby hospital and returned home fifteen minutes later. Upon his arrival home, his dog was barking and looking excitedly at the back door. Robert Skiba apparently thought little of this unusual behavior at the time. After calling upstairs for his granddaughter at 10:00 a.m. and receiving no response, however, he went upstairs to check on her. Upon entering Tiffany Skiba's bedroom to rouse her, Robert Skiba was met with the ghastly sight of his granddaughter's corpse lying in bed, covered in blood and full of puncture wounds.

Police officers who arrived at the scene discovered a broken steak knife next to Skiba's body. The knife was part of a set belonging to her grandparents. There was blood on the knife, in the surrounding area, on the stairway heading down from the second-floor bedroom, and on the first-floor living room's door frame. The police discovered that the screen on a basement window had been removed and that one of the panes of glass had been shattered. Although it was normally kept closed, the door leading from the basement into the rest of the house was open. One of Skiba's uncles had once shown Frazier how to gain access to the house through the basement window when they had been accidentally locked out. The neighboring yard contained footprints that pointed away from the Skiba residence. A study of the footprints revealed that they were made by someone wearing size nine or ten boots in a style sold exclusively by K-Mart.

Also on the morning of November 8, 1990, Frazier visited a medical clinic to get treatment for a one-inch cut on his wrist. The cut was consistent with a stab wound. That night, Frazier drove to the home of his friends, the Shamons, in a car that he had rented at the airport two days earlier. The police arrested him at the Shamons' home on November 12, 1990. At the time of his arrest, Frazier had with him a letter from the United States Supreme Court informing him that his petition for certiorari had been denied. In Frazier's apartment

the police discovered a receipt from K-Mart for a size-nine boot of the same style found imprinted in the neighboring yard near the Skiba residence.

Frazier was taken to the Medina County jail. He was transported the next day from the jail to a clinic, where the long-ordered paternity test was administered. The test confirmed that Frazier had fathered Skiba's son.

On November 14, 1990, Frazier telephoned Officer James Svekric from the jail. Frazier had known Svekric for many years, and Svekric was one of the police detectives who had transported Frazier the previous day. Frazier asked Svekric to bring him Frazier's telephone book and prescription medication. Svekric, accompanied by another police officer, visited Frazier that day. According to Svekric, Frazier waived his right not to incriminate himself and asked the officers "what [they] could do for him, if [they] could get him a definite sentence in Cleveland as to a flat time, how much time he was going to do if he was to plead guilty." The police officers told Frazier that although they could tell the prosecutor and the judge that Frazier had cooperated, they had no authority to negotiate a plea agreement. Frazier then returned to his cell.

A short time later, however, the police officers conducted a second interview with Frazier, this time in the presence of the local prosecutor, Tim McGinty, who had been waiting in an adjacent building. McGinty informed Frazier that he was about to bring the matter of Skiba's death before a grand jury and that he intended to have Frazier indicted for murder. Frazier offered to provide information about other crimes in exchange for an agreement to allow him to plead guilty. McGinty replied, however, that in order to establish his credibility, Frazier would need to provide the details of Skiba's murder. Frazier was then asked whether he intended to kill Skiba when he went to her grandparents' home on November 8, 1990. In Svekric's recounting, "he shook his head no, but he did not give us a verbal answer or explain

what his intent was that morning." Svekric related the remainder of the interview as follows:

> And I asked him a question, "Do you want to tell us exactly what happened on November 8th with Tiffany Skiba, yes or no," and his answer was, "Yes, I will tell you everything you want to know." But at that time he also stated that he thinks his attorney should be present . . . .

Frazier's jailhouse interview was then terminated.

## B.    Procedural background

The Cuyahoga County grand jury returned a three-count indictment against Frazier. Count One charged him with the murder of Skiba. The first count contained three death-penalty specifications—for felony murder, the murder of a witness, and murder to escape accounting for another crime. Count Two charged Frazier with the murder of Skiba during the commission of a burglary. It also contained the three identical death-penalty specifications enumerated in Count One. The third count charged Frazier with burglary.

On August 21, 1991, the jury convicted Frazier on all counts. The next phase of the trial concerned the appropriate penalty, at the conclusion of which the jury recommended that Frazier be sentenced to death. On August 29, 1991, the trial court adopted that recommendation.

Frazier appealed his conviction and sentence without success through the Ohio state courts, both on direct appeal and through a petition for postconviction relief. He then initiated federal proceedings for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in September of 1998. The district court denied his petition, but granted him a certificate of appealability on all issues. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies to Frazier's case because he filed his habeas corpus petition after the Act's effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). A federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state-court judgment, but only if the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). All of Frazier's claims are governed by § 2254(d)(1).

A federal court may grant a writ of habeas corpus under § 2254(d)(1)'s "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Section 2254(d)(1)'s "unreasonable application" clause provides two additional bases for habeas relief. *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001), *cert. denied*, 535 U.S. 975 (2002). The first avenue of relief occurs if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts . . . ." *Williams*, 529 U.S. at 413. Second, relief is available under this provision if the state-court decision "either unreasonably

extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Campbell*, 260 F.3d at 539.

The Supreme Court has declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. In its elaboration on the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

In the present case, the district court applied the standards set forth under AEDPA and determined that Frazier was not entitled to habeas relief. We review de novo the district court's denial of Frazier's petition. *Macias v. Makowski*, 291 F.3d 447, 451 (6th Cir. 2002).

### B. Certificate of appealability

Before reaching the merits of Frazier's claims, we address a procedural problem that has hindered our consideration of this appeal. The district court in this case granted a certificate of appealability on all issues, with the following explanation:

Until such time as such precedent is submitted to me, and, is shown to be applicable to a case at hand, I expect that I shall, as I did in this case, grant certificates of appealability in capital habeas cases as a matter of routine.

Others may view this as an abdication of responsibility; it is, rather, a manifestation of the possibility of my own fallibility, and concern that I may have erred. I do not believe that I have erred—but doubt

that I have, no matter how strongly felt, is not certainty that I have not.

This rationale is contrary to our decision in *Porterfield v. Bell*, 258 F.3d 484 (6th Cir. 2001), which was also a capital-murder case. Like here, Porterfield had been granted a certificate of appealability on all issues. We noted in *Porterfield* that such a blanket grant conformed to neither the commands of 28 U.S.C. § 2253(c) (providing in part that a "certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right . . . [and] shall indicate which specific issue or issues satisfy the showing required"), nor the Supreme Court's construction of the statute in *Slack v. McDaniel*, 529 U.S. 473 (2000) (holding that the requirements of § 2253(c) applied regardless of whether the district court rejected a constitutional claim on the merits or on procedural grounds). Because a blanket grant "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability," and "because the district court [was] already deeply familiar with the claims raised by petitioner," we vacated the certificate of appealability in *Porterfield* and remanded the matter "in order to permit the court to engage in the reasoned assessment of each . . . claim as required by *Slack*." 258 F.3d at 487.

The language of § 2253(c) is mandatory. It was therefore error for the district court to issue a blanket certificate of appealability without any analysis. We recognize, however, that the district court rendered its decision before our opinion in *Porterfield*. In contrast to *Porterfield*, moreover, both parties in the present case have already briefed the merits of Frazier's claims, so that vacating the certificate of appealability would "further delay an already lengthy process." 285 F.3d at 485. For these reasons, we will excuse the procedural error of the district court. This is an appropriate time, however, to reiterate both that a certificate

of appealability may issue *"only* if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2) (emphasis added), and that any such certificate "*shall* indicate which specific issue or issues satisfy the showing required," *id.* § 2253(c)(3) (emphasis added).

To focus our consideration of the issues in the face of this blanket certificate of appealability, we asked counsel for Frazier at oral argument which claims he perceived to be his strongest. He replied that his primary claims for habeas relief were those premised upon the due process right to a fundamentally fair trial and those based upon the ineffective assistance of counsel. We agree, particularly in light of the fact that the district court singled out "the remarkable and unnecessary misconduct of the prosecutor" as a concern regarding the petitioner's right to a fair trial. Accordingly, we devote our attention to these two issues first.

## C.   The right to a fundamentally fair trial

Frazier alleges that he was denied his due process right to a fair trial, both because certain evidence was improperly admitted and because of prosecutorial misconduct. "Cases in [the Supreme] Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).

### 1.   *Due process and evidentiary matters*

Frazier's first contention is that the trial court improperly admitted (1) cumulative, gruesome photograhs of Skiba's corpse, (2) evidence that Skiba was terrified of Frazier, and (3) evidence that Frazier raped Skiba. To the extent that this is a challenge to the technical correctness of these evidentiary rulings, we lack authority to consider the challenge. *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) ("A state court evidentiary ruling will be reviewed by a federal *habeas* court only if it were so fundamentally unfair as to violate the

petitioner's due process rights."). Rather, Frazier must demonstrate that the state court's conclusion — that the admission of the challenged evidence did not violate his due process rights — was unreasonable, as those rights have been articulated by the Supreme Court.

Frazier argues that the admission into evidence of multiple photographs of Skiba's corpse was excessive. He notes that the Supreme Court has stated: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

The Ohio Supreme Court directly addressed this evidentiary issue, concluding that the multiple photographs "were introduced during the coroner's testimony to illustrate the testimony," that "[e]ach photograph presents a different perspective of the victim," and that the photographs "were used to illustrate" the nature of the encounter that immediately preceded Skiba's death. *State v. Frazier*, 652 N.E.2d 1000, 1010 (Ohio 1995). It ultimately determined that the photographs' "probative value substantially outweigh[ed] the danger of unfair prejudice" to Frazier. *Id.* We conclude that the Ohio Supreme Court's resolution of Frazier's federal constitutional claim concerning the admission of multiple photographs of Skiba's corpse was not an unreasonable application of federal law as articulated by the Supreme Court. *See Willingham v. Mullin*, 296 F.3d 917, 928-29 (10th Cir. 2002) (refusing to grant relief on a habeas petitioner's claim that the admission of 22 photos of the victim's body was so unduly prejudicial as to render his trial fundamentally unfair, where the state court provided a reasonable basis for concluding that the photographs' relevance outweighed the danger of unfair prejudice).

Frazier next contends that the admission of evidence that Skiba feared him rendered his trial fundamentally unfair. In the opinion of the Ohio Supreme Court, such evidence was

admissible as a present-state-of-mind exception to the hearsay rule. *Frazier*, 652 N.E.2d at 1013. The district court concluded that evidence of Skiba's fear "supported the substantial evidence of [Frazier's] likely motive." Although we find that the relationship between Skiba's fear and Frazier's motive is tangential at best, we recognize the existence of a logical argument that the relevance of such evidence outweighed its potential prejudice. We are unaware, moreover, of any Supreme Court precedent that establishes that the admission of evidence that a murder victim feared the defendant violates the defendant's due process rights. Frazier's assertion that "[s]everal states have held unambiguously that the state of mind of a murder victim is irrelevant to the issue of the identity of the perpetrator" has no bearing on our task under AEDPA. We therefore conclude that the state courts' resolution of this matter was not an unreasonable application of federal law.

The third category of evidence challenged by Frazier concerns his alleged rape of Skiba and paternity of her child. He claims that the admission of the evidence without a limiting instruction rendered his trial fundamentally unfair. Before reaching the merits of this claim, we must first consider the state's argument that this challenge was rejected by the state courts on the basis of state procedural rules.

A federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment "rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the [state] court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). The adequate-and-independent-state-ground doctrine has been applied in refusing to address the merits of a federal claim because of violations of state procedural rules, such as the failure to make a timely objection at trial. *Id.* at 261. An adequate and independent finding of procedural default will preclude habeas corpus relief "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

In determining whether a procedural default has occurred and, if so, what effect the default will have on federal review of a state conviction, the district court must consider whether (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief. *Reynolds v. Berry*, 146 F.3d 345, 347 (6th Cir. 1998). The rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the rule relied upon by the state courts involves a "firmly established and regularly followed state practice." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). Furthermore, a procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case "clearly and expressly states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (internal quotation marks omitted).

In this case, the Ohio Supreme Court noted that Frazier failed to object at trial to the omission of a limiting instruction. It therefore analyzed his entitlement to the inclusion of such a jury instruction using the "plain-error" standard. But the larger issue was whether "the trial court erred by admitting evidence of other crimes committed by [Frazier]." *Frazier*, 652 N.E.2d at 1013. The Ohio Supreme Court analyzed the claim on its merits, ultimately finding Frazier's argument to be "without merit." *Id.* at 1013, 1014. We therefore conclude that Frazier is not procedurally barred from presenting the claim that the admission of evidence about his rape of Skiba and the paternity of her child rendered his trial fundamentally unfair.

Turning to the merits of the claim, we agree with the Ohio Supreme Court that the evidence was directly relevant to Frazier's motive and to the death-penalty specifications. The United States Supreme Court decision upon which Frazier relies in pressing this claim held that the introduction of evidence of prior crimes, where relevant to prove death-penalty specifications, is *not* unconstitutional. *Spencer v. Texas*, 385 U.S. 554, 568-69 (1967). We therefore conclude that the admission of evidence that Frazier raped Skiba and fathered her child, even without a limiting instruction, was not an unreasonable application of Supreme Court precedent and did not deprive Frazier of his due process rights.

### 2.   *Due process and prosecutorial misconduct*

Frazier's next contention is that prosecutorial misconduct deprived him of his right to a fair trial. Frazier identifies eight examples of what he characterizes as prosecutorial misconduct. Some of the conduct that he challenges took place during the guilt phase of his trial, while other instances occurred during the penalty phase. Our conclusion in Part II.D. below that Frazier must be given a new sentencing hearing makes it unnecessary for us to consider the alleged prosecutorial misconduct that occurred during the penalty phase.

None of the alleged prosecutorial misconduct in the guilt phase of the trial impinged upon a particular provision in the Bill of Rights. The relevant question, therefore, is whether the prosecutorial conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). To decide this question, we first determine whether the conduct about which Frazier complains was indeed improper. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). A four-factor test is then applicable to any conduct that we find inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated

or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.*

Frazier takes issue with the following instances of the prosecutor's conduct during the guilt phase of the trial: (1) using a photograph of Skiba taken before her murder in his closing argument, (2) relying on Skiba's fear of Frazier as part of the state's case-in-chief, (3) referring to Skiba's character during his closing and rebuttal argument, and (4) placing an empty chair before the jury during his closing argument to "represent" Skiba. The first instance, the use of a photograph of Skiba during closing argument, has been found by some courts to be within the bounds of acceptable conduct. *Nefstad v. Baldwin*, No. 94-35714, 1995 WL 520050, at *2-*3 (9th Cir. Sept. 1, 1995) (finding no error by the trial court in permitting a "closing argument [wherein] the prosecutor asked the jury to compare a photograph of the victim before the murder with an autopsy photograph of the victim"); *Lowe v. Abrahamson*, No. 92-2020, 1995 WL 150585, at *1-*2 (7th Cir. Apr. 6, 1995) (order) (finding "nothing improper" about "the presentation at trial of a photograph of the murdered victim wearing a hat from his son's Little League baseball team"). Other courts have found such photographs of the victim improper. *Cargle v. Mullin*, 317 F.3d 1196, 1223-24 (10th Cir. 2003) (agreeing with the state court's determination that the trial court erred in admitting "a number of photographs of the victims while they were alive" because the photographs were "irrelevant and prejudicial"). The state courts in this case determined that the prosecutor's use of Skiba's photograph during closing argument was not improper. In light of the split of authority about the propriety of such conduct, we cannot say that the state courts' determination was unreasonable.

The second instance of alleged prosecutorial misconduct concerns the state's reliance on Skiba's fear of Frazier as part of its proof. As noted above in Part II.C.1., the state courts ruled that such evidence was relevant and admissible. There

is nothing improper about a prosecutor's reliance on a state court's evidentiary ruling, whether or not the ruling itself was correct.

The third instance concerns the prosecutor's references to Skiba's character during his closing and rebuttal argument in the guilt phase of the trial. These references had no relevance to any matter in issue and were therefore improper. The Ohio Supreme Court reached the same conclusion. *Frazier*, 652 N.E.2d at 1015 (commenting that "the prosecutor's remarks were intemperate"). This leads us to the application of the *Carter* factors. In this instance, the prosecutor's remarks were not limited to an isolated instance. On the other hand, they did not form the centerpiece of the prosecutor's argument. But the prosecutor's remarks were plainly deliberate. Furthermore, the state's case was not unusually strong. The evidence was sufficient to prove the defendant guilty beyond a reasonable doubt, but it was not overwhelming. There were no witnesses and no confession (only an ambiguous offer to plead guilty), and the state produced no blood-type or DNA evidence.

Whether the references to Skiba's character tended to mislead the jury or prejudice the defendant is more difficult to determine. Although the prosecutor's remarks did not misstate the evidence, they were in a sense misleading concerning the law. The prosecutor's explicit juxtaposition of the defendant's constitutional rights (like the presumption of innocence) with the "rights" of the decedent (like "the right to go on to college" or "the right to walk down the aisle") suggested to the jury that certain nonexistent rights of the decedent somehow balanced or nullified the constitutional rights of the defendant. On the other hand, although a defense objection to the prosecutor's remarks was overruled, the trial court correctly instructed the jury on the law, specifically stating: "You must not permit sympathy or bias, prejudice or favoritism for either side to affect your judgments."

A similar analysis applies to the fourth and final alleged incident of prosecutorial misconduct during the guilt phase, the placing of an empty chair before the jury during the prosecutor's closing argument to "represent" Skiba. We again agree with the Ohio Supreme Court's conclusion that this conduct was improper. *Frazier*, 652 N.E.2d at 1015 ("We agree with appellant that the use of the empty chair was excessive.") It was also deliberate. The empty chair, however, was not the focus of the prosecutor's argument, and the state trial court properly instructed the jury not to be influenced by sympathy, bias, or prejudice.

Were we to consider Frazier's claim of prosecutorial misconduct in the first instance, after weighing all of the pertinent factors, the possibility exists that we might be persuaded that he was denied a fundamentally fair trial. But that is not our task. Rather, our inquiry is limited to deciding whether the Ohio Supreme Court's contrary determination was an unreasonable application of clearly established federal law. Because the direction in which the *Carter* factors point is neither obvious nor unambiguous, we conclude that the Ohio Supreme Court's resolution of Frazier's prosecutorial-misconduct claim was not unreasonable. *See Macias v. Makowski*, 291 F.3d 447, 454 (6th Cir. 2002) (holding that, although the court "might have concluded that the prosecutor's comments violated [the petitioner's] due process rights," the state court of appeals's contrary conclusion was not unreasonable, where two factors weighed in favor of the petitioner's claim and two weighed against it).

### D. The right to the effective assistance of counsel

Frazier's other major claim is that he was denied his right to the effective assistance of counsel during the penalty phase of the trial, a right guaranteed by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). Once a defendant has been convicted of a capital offense in Ohio, the jury "shall consider, and weigh against the aggravating circumstances proved beyond

a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender" and seven other factors, including "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." Ohio Rev. Code § 2929.04(B). A sentence of death is appropriate only if the jury is unanimously convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. *Id.* § 2929.03(D)(2).

The jury had already found Frazier guilty beyond a reasonable doubt of the death-penalty-specification charges. Because no mitigation proof was introduced by Frazier at the guilt phase of the trial, he was therefore virtually guaranteed a sentence of death unless he could produce sufficient mitigation evidence at the penalty phase to generate reasonable doubt in the mind of at least one juror about whether the aggravating factors outweighed the mitigating factors. But the sum total of the evidence presented on Frazier's behalf during the penalty phase of the trial was the following unsworn statement: "Ladies and gentlemen, I know you found me guilty, and in the past I have done things that were wrong, but I am not guilty of this crime and I am asking you to spare my life."

The test for establishing constitutionally ineffective assistance of counsel is two-fold. A defendant must first show that the performance of his or her counsel was "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In order to avoid second-guessing trial counsel's strategic decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). The second requirement of an ineffective assistance

claim is that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Frazier's ineffective-assistance claim was rejected by the Ohio Court of Appeals on the basis of the first prong of *Strickland*. The court explained: "From the record, it can reasonably be concluded trial counsel were appraised of the purported brain injury from their review of medical records; however, as a matter of trial strategy counsel deemed this avenue of defense unworthy of further pursuit." *State v. Frazier*, No. 71746, 1997 WL 764810, at *6 (Ohio Ct. App. Dec. 11, 1997).

The "purported brain injury" referred to above is the damage to Frazier's brain that occurred as the result of a 1987 fall from a ladder. Affidavits from postconviction experts on this matter indicate that Frazier suffers from a functional brain impairment. According to one, Frazier has a "significant history for head trauma" to the "frontal lobe" of his brain, which is "the site of impulse control, social judgment and reasoning." Frazier himself has described "a change in decision-making abilities after his head trauma." These reports also suggest that a correlation could exist between this injury and Frazier's criminal conduct. The state has not challenged the contention that Frazier's trial counsel could have developed this same information had they conducted a reasonable investigation.

We can conceive of no rational trial strategy that would justify the failure of Frazier's counsel to investigate and present evidence of his brain impairment, and to instead rely exclusively on the hope that the jury would spare his life due to any "residual doubt" about his guilt. This failure was not due to counsel's ignorance of Frazier's brain injury. To the contrary, the Ohio Court of Appeals acknowledged that trial counsel were actually aware of Frazier's brain impairment

because they saw his medical records, yet counsel failed to investigate the matter or present any evidence regarding the same.

Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. This court has commented when evaluating facts similar to those here that "the inadequacy of the attorney's investigation . . . was manifest." *Campbell v. Coyle*, 260 F.3d 531, 553 (6th Cir. 2001) (distinguishing the facts of *Campbell*, where trial counsel had the defendant evaluated by a mental health professional who did not find any mental illness, from those of *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998), where trial counsel had actual notice of the defendant's mental health problems but failed to investigate them). We do not believe that any reasonable attorney who saw the medical records indicating Frazier's brain injury would have declined to investigate the matter. At a bare minimum, a reasonable attorney would have compared the records with the medical literature on brain damage, elicited information from Frazier himself about the injury and its effects on him, or presented the records on Frazier to someone who could competently evaluate them. To do none of these things after seeing Frazier's medical records was unreasonable.

Our conclusion is bolstered by the Supreme Court's recent decision in the capital case of *Wiggins v. Smith*, 123 S. Ct. 2527 (2003). Trial counsel in *Wiggins* knew from their client's presentence report that he had lived in "misery as a youth," but they did not investigate his life history any further. *Id.* at 2536. The Maryland Court of Appeals was of the opinion that this performance comported with *Strickland*, but the United States Supreme Court disagreed and held that the state court's contrary conclusion was unreasonable. *Id.* at 2538. In *Wiggins*, as in the present case, "any reasonably competent attorney would have realized that pursuing these leads"—in Wiggins's case, allusions to his horrible

childhood; in Frazier's, medical records of his brain injury—"was necessary to making an informed choice among possible defenses . . . . Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Id.* at 2537.

Furthermore, as both this court and the Ohio Supreme Court have noted, residual doubt is not a mitigating factor under Ohio law. *Coleman v. Mitchell*, 268 F.3d 417, 447 (6th Cir. 2001); *State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997). This court nevertheless concluded in *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. 2000), albeit in dicta, that the pursuit of a residual-doubt strategy in that case was reasonable because the defendant's extensive criminal history would have come to light if the jury had heard about his background. C*f. Abdur'Rahman v. Bell*, 226 F.3d 696, 707-08 (6th Cir. 2000) (concluding that "trial counsel were ineffective in failing to further investigate the background of the accused," but finding no prejudice where "it probably would not have been the most prudent trial strategy to use proof of appellant's history of violent behavior and anti-social personality disorders at either the guilt or innocence phase or at the sentencing phase of the trial"). No such concerns could have justified the approach in the present case, however, where the jury had already heard considerable evidence about Frazier's rape of Skiba.

The prosecutor himself aptly summarized the strategy of Frazier's trial counsel during the penalty phase. After quoting Frazier's unsworn denial of guilt, the prosecutor stated: "That's it. Fifteen seconds of mitigation. Now, we heard a moment ago about factors of mitigation that you find. Apparently they don't know." This summary strikes us as accurate to the extent that it reflects the fact that Frazier's counsel failed to offer any evidence during the penalty phase that is recognized under Ohio law as mitigation. Based on the

above factors, we conclude that Frazier's trial counsel performed below an objective standard of reasonableness.

The Ohio Court of Appeals, on the other hand, implicitly held that Frazier's trial counsel performed at or above an objective standard of reasonableness when it opined that "as a matter of trial strategy counsel deemed this avenue of defense unworthy of further pursuit." We have concluded the opposite. The question under AEDPA, then, is whether the state court applied the first prong of *Strickland* unreasonably, or only erroneously. *See Bell v. Cone*, 122 S. Ct. 1843, 1852 (2002) (clarifying that the question of whether a state court's application of *Strickland* is unreasonable is conceptually distinct from the underlying question of whether counsel's performance fell short of an objective standard of reasonableness).

Three factors were cited by the Ohio Court of Appeals in support of its conclusion:

> 1) counsel's argument to the trial court that a psychologist would be used merely to interpret the mitigation expert's findings; 2) counsel's filing of the motion requesting a limitation on references to mitigation factors to only those upon which appellant ultimately relied; and 3) the thorough and professional manner in which counsel conducted appellant's defense during both the guilt and the penalty phase of appellant's trial.

*Frazier*, 1997 WL 764810, at *6. The first two factors, however, have no relevance in explaining how the strategy ultimately pursued by Frazier's counsel was reasonable. Although the third factor is relevant in determining whether the trial strategy was reasonable, it is largely conclusory and again provides no theory upon which trial counsel's "strategy" could have been based. We do not believe that it is reasonable to infer that a trial strategy, which is on its face irrational and for which no justification has ever been

produced, becomes reasonable simply because of "the thorough and professional manner" in which trial counsel otherwise performed.

We note, moreover, that the theory of Frazier's defense during the guilt phase of his trial was that Frazier did not commit the murder. He presented no insanity or diminished capacity defense. The jury therefore did not hear any evidence about Frazier's brain injury during the guilt phase of the trial. Indeed, it heard no evidence whatsoever during the guilt phase of the trial that could bear on the issue of mitigation. As the prosecutor accurately commented at the opening of the penalty phase: "The State's job is over. The proof of the aggravating circumstances here is monumental, unrebutted, and it is no mere allegation any longer. It is fact, since the conclusion of this case. There has been absolutely zero, zilch, nil evidence of mitigation." This being the situation, it appears to us that competent trial counsel for Frazier would have realized that their client had everything to gain and nothing to lose by introducing evidence of his brain injury at the penalty phase of the case. Yet they sat on their hands.

The instant case, therefore, is easily distinguishable from the ruling in *Bell*, where the defendant's trial counsel also introduced no evidence during the penalty phase of the trial. 122 S. Ct. at 1848. The state court concluded that this trial strategy passed muster under *Strickland*, and the Supreme Court held that the state court's conclusion was not unreasonable. *Id.* at 1853-54. Crucial to this determination, however, was the fact that the defendant had already introduced his best mitigation evidence during the guilt phase of the trial:

> Because the defense's theory at the guilt phase was not guilty by reason of insanity, counsel was able to put before the jury extensive testimony about what he believed to be the most compelling mitigating evidence in the case—evidence regarding the change his client

> underwent after serving in Vietnam; his drug dependency, which apparently drove him to commit the robbery in the first place; and its effects. . . . Defense counsel advised the jury that the testimony of the experts established the existence of mitigating circumstances, and the trial court specifically instructed the jury that evidence of a mental disease or defect insufficient to establish a criminal defense could be considered in mitigation.

*Id.* Frazier's counsel, in contrast, introduced absolutely no mitigating evidence during the guilt phase of the trial.

In sum, no reason at all has been adduced to justify the failure of Frazier's trial counsel to investigate and present evidence of his brain impairment, and to instead rely exclusively on an argument of residual doubt. The state court did not articulate one. Nor can we fathom one. Absent any reason to explain or justify such a trial strategy, we conclude that the state court's determination that Frazier's trial counsel had performed in a competent manner during the penalty phase was not simply erroneous, but unreasonable. *See Wiggins*, 123 S. Ct. at 2538 (rejecting as unreasonable a state court's determination that trial counsel performed adequately where, although no trial strategy could be articulated to justify counsel's unreasonable failure to investigate and present evidence of their client's terrible childhood, the state court "merely assumed that the investigation was adequate").

Habeas relief is thus warranted if Frazier can show that there is a reasonable probability that, but for his counsel's deficient performance, the result of the penalty phase would have been different. *See id.* at *16 ("In order for counsel's performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. . . . [O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."). To make this showing, Frazier must direct us to

mitigating evidence that could have been presented and that is sufficient to undermine our confidence in the outcome of the penalty phase. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Furthermore, AEDPA requires Frazier to have developed the factual bases for his claims during postconviction proceedings in state court. *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002) ("These rules apply both to entirely new legal claims and new factual bases for relief; for a claim to be considered exhausted, the habeas petitioner must have fairly presented to the state courts the substance of his federal habeas claim.") (internal quotation marks omitted).

We agree with the state that Frazier failed to develop any facts concerning his general history, character, and background in the state postconviction proceedings. Accordingly, we cannot consider the facts that Frazier was abandoned as a child or that he has an abnormal response to stress. The state concedes, however, that Frazier presented evidence concerning his brain injury to the state courts during the postconviction proceedings. Although information about the nature and severity of the injury was less thoroughly developed in those proceedings than it is now, sufficient facts were presented to indicate the existence of evidence concerning Frazier's brain injury that could have been developed and presented to the jury during the penalty phase.

We must therefore examine whether the existence of this evidence is sufficient to undermine our confidence in the result of the penalty-phase proceeding. Frazier's trial counsel presented only his unsworn denial of guilt, which does not amount to mitigating circumstances under Ohio law. This virtually assured him a sentence of death. Had trial counsel's performance not been deficient, the jury could have heard evidence of Frazier's fall from a ladder and associated brain injury, which could have correlated with his criminal conduct. Such evidence would have constituted mitigating circumstances under Ohio law. Ohio Rev. Code § 2929.04(B).

In concluding that Frazier had not shown prejudice, the district court observed in a footnote "that the evidence of record, in addition to enabling the jury to find the petitioner guilty beyond a reasonable doubt, shows that he acted with deliberation and forethought . . . . These acts do not manifest impulsive or uncontrolled behavior." This analysis, however, does not account for the probability that the jury would find that a murderer who suffers from a functional brain impairment is less morally culpable than one who does not, even if the brain impairment did not "cause" Frazier to murder Skiba.

Indeed, we think that the circumstances of the crime were amenable to such mitigating evidence. Competent trial counsel could have pointed out, for example, that the blood-stained, broken knife found beside Skiba's corpse came from her grandparents' silverware, and that Skiba had been sleeping with a knife under her pillow. Furthermore, during the jailhouse questioning of Frazier on November 14, 1990, the police officers and prosecutor did not ask Frazier whether he murdered Skiba. They asked, instead, whether he intended to kill her when he went to her grandparents' home on the morning of the murder. Frazier shook his head no in response to that question. Trial counsel could thus have depicted a scenario in which Frazier went unarmed to Skiba's grandparents' home to confront or threaten her, not to kill. But when he encountered the knife-wielding Skiba, Frazier succumbed to the stress of the moment, grabbed the knife from her hands, and wildly stabbed Skiba far more times than would have been necessary to kill her.

Such a scenario fits the facts of the crime and is made plausible by the existence of a functional brain impairment, which, although it might not have turned Frazier into a cold and calculating murderer, could have impaired his ability to deal with stressful or emotional situations, even ones of his own making. This is but one example of how competent trial counsel might have utilized the evidence of Frazier's functional brain impairment to generate reasonable doubt that

the aggravating circumstances outweighed the mitigating circumstances in the present case. We are by no means suggesting that the presentation of such evidence and argument would have assured Frazier the avoidance of the death penalty, but we are saying that this outcome is within the realm of reasonable probability as defined in *Strickland*. 466 U.S. at 694.

As the Supreme Court observed in *Williams v. Taylor*, 529 U.S. 362, 398 (2000): "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine . . . the prosecution's death-eligibility case." In *Williams*, the Court recognized that "the reality that [the defendant] was 'borderline mentally retarded[]' might well have influenced the jury's appraisal of his moral culpability." *Id.* We conclude that the same is true here. Had the jurors been confronted with the mitigating evidence of Frazier's brain injury, the probability that at least one juror would not have decided that the aggravating circumstances of the case outweighed the mitigating circumstances beyond a reasonable doubt "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2543 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); Ohio Rev. Code § 2929.03(D)(2) (requiring jury unanimity for the imposition of a death sentence). We therefore hold that Frazier has established that his right to the effective assistance of counsel was violated at the penalty phase of his trial, and that the state court's conclusion to the contrary is an unreasonable application of clearly established Supreme Court precedent.

The dissent does not quibble with the foregoing analysis on the merits. It contends instead that "Frazier's claim of ineffective assistance of counsel is procedurally defaulted and this court consequently has no business considering the merits of that claim." (Dissenting Op. at 34) According to the

dissent, the Ohio Court of Appeals never reached the merits because it held that the claim was barred by the state-law doctrine of res judicata. (*Id.*)

This will surely come as a surprise to the state, which (1) conceded in its brief that "Frazier did present his 'brain damage' claim to the state courts," and (2) then proceeded to argue that "the Ohio court's finding that trial counsel acted competently in this regard is not an unreasonable application of *Strickland*." We therefore believe that the dissent mischaracterizes the state's argument by asserting that the state raised a procedural-default defense to every instance of ineffective assistance alleged by Frazier. Instead, the state made clear its position that Frazier had forfeited any ineffective-assistance claim premised upon his abandonment as a child or his abnormal response to stress, and that his preservation of the claim based upon his brain damage did not permit him to revive his other instances of ineffective assistance.

As the above-quoted language demonstrates, however, the state did not contend that Frazier procedurally defaulted his ineffective-assistance claim based upon his counsel's failure to investigate and present evidence of his brain damage. The state's failure to raise the issue of procedural default with respect to this instance of ineffective assistance is itself sufficient to dispense with our consideration of the question. "A court of appeals is not 'required' to raise the issue of procedural default *sua sponte*." *Trest v. Cain*, 522 U.S. 87, 89 (1997).

Even if the state had not waived its procedural-default defense, moreover, we do not believe that the defense would be applicable in this case. "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal quotation marks omitted). Contrary to the

dissent's interpretation of the discussion by the Ohio Court of Appeals, we find no clear and express statement in the opinion that the state procedural doctrine of res judicata was the basis for the decision.

The Ohio Court of Appeals concluded its analysis of Frazier's ineffective-assistance claim as follows:

> In view of the fact that appellant had the assistance of at least three experienced attorneys during all phases of the trial proceedings, and mindful that a reviewing court will not second-guess what are essentially matters of trial strategy, neither the record nor appellant's evidence provided *dehors* the record supported his claim.

*Frazier*, 1997 WL 764810, at *6. We do not believe that the above statement can be fairly characterized as a determination that Frazier had attempted to present evidence that should have been presented on direct appeal. Rather, the Ohio court's conclusion goes to the merits of Frazier's claim.

Disposing of Frazier's ineffective-assistance claim on the merits was also sensible as a matter of state law. The Ohio Supreme Court has held that "[w]here defendant, represented by new counsel upon direct appeal, fails to raise therein the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence *dehors* the record, *res judicata* is a proper basis for dismissing defendant's petition for postconviction relief." *State v. Cole*, 443 N.E.2d 169, 170 (Ohio 1982) (syllabus). According to the dissent, the Ohio Court of Appeals decided that Frazier's claim was barred by res judicata after concluding that the evidence provided by his postconviction experts was not new because trial counsel had been "appraised of the purported brain injury." (Dissenting Op. at 36 (quoting *Frazier*, 1997 WL 764810, at *6)) Such a decision, however, would have been a mistaken application of *Cole*, because, as our own analysis of Frazier's claim demonstrates, the simple fact that trial counsel "had been appraised of the purported brain

injury" does not in and of itself establish ineffective assistance of counsel. We thus conclude that the dissent's reading of the decision by the Ohio Court of Appeals is plausible, but that it is neither the only nor the best interpretation.

The Ohio Court of Appeals's decision also contains no express statement that its conclusion on the merits of Frazier's ineffective-assistance claim is an alternative holding. This contrasts with that court's disposition of another argument raised by Frazier concerning "the trial court's failure to grant appellant's motion for a psychological expert in mitigation," as to which the appellate court specifically stated that "the trial court properly applied the doctrine of *res judicata*." *Frazier*, 1997 WL 764810, at *6.

In sum, the state did not raise the issue of procedural default with respect to the "brain damage" claim by Frazier upon which we grant relief. Alternatively, we do not believe that the Ohio Court of Appeals clearly and expressly rested its decision regarding this claim on an independent state procedural ground. We are therefore unpersuaded by the thoughtful argument of the dissent.

## E.   Remaining claims

Frazier advances sixteen other claims on appeal that merit substantially less discussion. Having concluded that the penalty phase of Frazier's trial was constitutionally defective, we have no need to consider any other arguments concerning that portion of the trial. We therefore will not address Frazier's claim that he was entitled to the appointment of an independent psychological expert for the penalty phase, or his claim that the trial court's instruction to the jury at the penalty phase was unconstitutional.

Of the remaining fourteen claims, the only one that deserves further discussion by this court is Frazier's argument that his rights under the *Ex Post Facto* Clause, U.S. Const.

art. I, § 9, cl. 3, were violated. As detailed in Part I.A. above, Frazier, while in jail and without a lawyer, requested and received a meeting with two police officers and Prosecutor McGinty on November 14, 1990. Frazier essentially offered to plead guilty to the rape and murder of Skiba in exchange for a definite prison term. That offer played prominently in the state's presentation of its case. Frazier argues that the admission of evidence concerning his offer was made possible only by a change in the Ohio rules of evidence that occurred after the offense but prior to trial, resulting in a violation of the *Ex Post Facto* Clause.

In November of 1990, when Skiba was murdered, Rule 410 of the Ohio Rules of Evidence provided that evidence of "an offer to plead guilty or no contest to the crime charged or to any other crime, or statements made in connection with, and relevant to, any of the foregoing . . . offers, is not admissible in any . . . criminal proceeding against the person who made the offer." Rule 410 was revised in July of 1991. The revised version, in effect during Frazier's trial, prohibited the introduction of evidence concerning "[a]ny statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn." Ohio R. Evid. 410(5).

Every court to have considered Frazier's *ex post facto* claim has resolved it by concluding that, because the police officers and the prosecutor told Frazier that they could not negotiate a plea bargain at that time, no plea discussions took place on November 14, 1990. We find this analysis problematic. Although current Rule 410 requires the occurrence of plea discussions in order to activate the prohibition, former Rule 410 does not. The former rule instead references only "an offer to plead guilty." Thus, were we in a position to decide this question of state law in the first instance, it would seem to us that Frazier's offer to plead guilty was admissible under current Rule 410, but not under former Rule 410. Of course, it is the contrary judgment of the Ohio Supreme Court that

counts in construing the Ohio Rules of Evidence. *See Frazier*, 652 N.E.2d at 1012 ("[W]e concur with the lower courts in their determination that the interview that occurred on November 14, 1990 was simply not a plea discussion. We would reach the same result regardless of which version of Evid. R. 410 we applied.") (emphasis omitted).

We add, moreover, that the *Ex Post Facto* Clause is not implicated by the change to Rule 410. Frazier argues that the Clause is violated by "[e]very law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.). But the change to Rule 410 did not alter the quantum of evidence necessary to convict Frazier. Rather, it expanded the range of admissible testimony. The Supreme Court explained the difference over a century ago:

> Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not . . . alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

*Hopt v. Utah*, 110 U.S. 574, 589 (1884); *see also Carmell v. Texas*, 529 U.S. 513, 542-47 (2000) (explaining the distinction). In addition to falling short under AEDPA, therefore, Frazier's *ex post facto* claim fails on the merits.

The district court disposed of Frazier's thirteen remaining claims in a careful and detailed manner. These claims range from the contention that Ohio's statutory scheme of capital punishment is unconstitutional to the argument that the instruction on reasonable doubt given by the trial court was constitutionally deficient. Our discussion of these other claims would be duplicative and serve no useful purpose. We

therefore adopt the reasoning of the district court as to all of these remaining claims and find them without merit.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** in part the judgment of the district court, **GRANT** Frazier a conditional writ of habeas corpus that will result in the vacation of his death sentence unless the state of Ohio commences a new penalty-phase trial against him within 180 days from the date that the judgment in this matter becomes final, and **REMAND** the case for further proceedings consistent herewith.

---

### CONCURRING IN PART, DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. The majority entertains the question of whether Frazier received the effective assistance of counsel at the mitigation stage of his trial, despite the fact that the Ohio courts never reached that question because, they held, Frazier's claim was barred by the state law doctrine of *res judicata*. Because Frazier's claim of ineffective assistance of counsel is procedurally defaulted and this court consequently has no business considering the merits of that claim, I respectfully dissent from the majority's holding in Part II.D of its opinion. To the extent that the claims addressed in Parts II.C and II.E are not waived or procedurally defaulted, I concur in the majority's treatment of those claims, *see* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"), as I do in the remainder of its opinion.

### I

Before addressing the legal arguments the majority makes in Part II.D, it is important to understand the treatment of Frazier's ineffective assistance of counsel claim by the Ohio courts. After his conviction and sentencing in state trial court, Frazier appealed to the Ohio Court of Appeals, where he raised fourteen assignments of error. In none of those assignments did Frazier mention the issue of the effectiveness of his trial counsel, despite the fact that Frazier's attorneys on appeal were not the same lawyers that represented him at

trial.[1] On appeal by right to the Ohio Supreme Court, Frazier once again failed to raise his claim of ineffective assistance of counsel.

After the United States Supreme Court denied Frazier's petition for a writ of certiorari, he brought a petition under Ohio Rev. Code § 2953.21 (1997),[2] to vacate or set aside his sentence in the Cuyahoga County, Ohio, Court of Common Pleas, and asserted for the first time that his trial counsel were ineffective because they failed to investigate and present mitigating evidence at the sentencing phase of his trial. The Court of Common Pleas, without addressing the merits of this claim, stated as follows:

> Consistent with the principles of *res judicata*, matters which have been or should have been raised on direct appeal may not be considered in post-conviction proceedings. *State v. Ishmail* (1981), 67 Ohio St. 2d 16. In addition, where a defendant, represented by new counsel on direct appeal, fails to raise the issue of competent trial counsel and said issue could fairly have

been determined without evidence [beyond] the record, *res judicata* is a proper basis for dismissing the defendant's Petition for Post-Conviction Relief. *State v. Cole* (1982), 2 Ohio St. 3d 112.

J.A. at 312 (Court of Common Pleas opinion). Because, the court held, Frazier's trial counsel were different from his counsel on direct appeal, "[a]ny [in]effective assistance of counsel [claim] concerning trial counsel's performance should have been raised on direct appeal in accordance with *Cole*." *Id.* The court therefore granted the State's motion to dismiss, and denied Frazier's request for an evidentiary hearing.

The Ohio Court of Appeals affirmed. After examining the "new evidence" of his "organic brain impairment" that Frazier claimed was unavailable at trial,[3] the court held that the evidence was not new, and hence did not permit Frazier to overcome the bar of *res judicata*. The court noted that "it can reasonably be concluded trial counsel were appraised of the purported brain injury from their review of the medical records; however, as a matter of trial strategy counsel deemed this avenue of defense unworthy of further pursuit."[4] *State v. Frazier*, No. 71746, 1997 WL 764810, at *6 (Ohio Ct. App. Dec. 11, 1997). This conclusion, the court said, was

---

[1] Frazier did challenge the constitutionality of several Ohio statutes on the basis that those statutes worked to deprive him of the effective assistance of counsel. However, he did not argue on direct appeal that *his* counsel were ineffective.

[2] Ohio Rev. Code § 2953.21 provides, when a prisoner has filed for post-conviction relief, that "[u]nless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues . . . ." § 2953.21(E) (1997). However,

> [b]efore granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, [and] all the files and records pertaining to the proceedings against the petitioner . . . .

§ 2953.21(C).

[3] Ohio law provides that the procedural bar of *res judicata* does not apply in this context if the petitioner sets forth, in support of his newly raised claim, evidence that was not available at trial or on direct appeal, and without which the defense could not have been expected to raise the new claim. *See State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982).

[4] The majority agrees with the Ohio courts' factual finding that Frazier's trial attorneys knew enough about his head injury to present that evidence for mitigation purposes: "Although information about the nature and severity of the injury was less thoroughly developed in those [state postconviction] proceedings than it is now, sufficient facts were presented to indicate the existence of evidence concerning Frazier's brain injury that could have been developed and presented to the jury during the penalty phase." Supra, at 25.

"reinforced" by three factors, namely, (1) counsel's argument that a psychologist would merely interpret the findings of the mitigation expert; (2) counsel's filing of a motion to limit reference to mitigating factors; and (3) "the thorough and professional manner in which counsel conducted appellant's defense . . . ."**[5]** *Id.* These statements by the Ohio Court of Appeals were not made in the context of discussing the merits of Frazier's claim of ineffective assistance of trial counsel, but in the context of determining whether that ineffective assistance claim was barred by the state law doctrine of *res judicata*. The Common Pleas Court, without reaching the merits of that claim, had granted the state's motion to dismiss Frazier's post-conviction petition, holding that the claim was barred by *res judicata*. The Court of Appeals affirmed that judgment, mentioning the merits only to the extent of explaining their conclusion that the "new" evidence of head injury Frazier urged the court to rely on in order to get around the *res judicata* bar was not new at all.

## II

Respondent Huffman raises Frazier's "failure to present the [ineffective assistance of counsel] claim and the facts in support of it to the state courts." Huffman Br. at 49-50. Notwithstanding the Supremacy Clause of the Constitution, *see Cooper v. Aaron*, 358 U.S. 1, 18-19 (1958), federal habeas courts are not free to undertake a plenary review of all claims brought pursuant to 28 U.S.C. § 2254. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 81 (1977) ("a state

---

**[5]** The majority correctly notes that "[t]he first two factors . . . have no relevance in explaining how the strategy ultimately pursued by Frazier's counsel was reasonable." Supra, at 22. But this statement indicates that the majority misunderstands the legal analysis that the Ohio Court of Appeals undertook. The Ohio Court of Appeals was not seeking to support the "reasonableness" of the trial counsel's investigatory tactics (or lack thereof); rather, the court was explaining the basis for its conclusion that trial counsel was aware of evidence Frazier claimed was not available at trial, a matter to which the first two factors are obviously relevant.

decision resting on an adequate foundation of state substantive law is immune from review in the federal courts"). Instead, this court must first consider whether Frazier's ineffective assistance of counsel claim is properly before it prior to discussing the merits of that claim.

This issue "concerns the respect that federal courts owe the States and the States' procedural rules when reviewing the claims of state prisoners in federal habeas corpus." *Coleman v. Thompson*, 501 U.S. 722, 726 (1991). The Supreme Court has held that "[w]here the petitioner . . . failed properly to raise his claim on direct review, the writ [of habeas corpus] is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged . . . violation.'" *Reed v. Farley*, 512 U.S. 339, 354 (1994) (quoting *Wainwright v. Sykes*, 433 U.S. at 84). This rule applies when a state court, relying upon a state rule of law, refused on collateral appeal to consider a claim that the petitioner could have raised on direct review, and the petitioner now raises the same claim on habeas appeal. *Teague v. Lane*, 489 U.S. 288, 297-98 (1989) (holding that petitioner's claim, which he failed to raise on direct review in state court, was procedurally defaulted because the Illinois appeals court refused, on the basis of a state law doctrine of *res judicata*, to consider the claim in a state collateral proceeding); *Coleman v. Mitchell*, 268 F.3d 417, 428-29 (6th Cir. 2001) (Clay, J.) (holding that Ohio's doctrine of "*res judicata* under § 2953.21 [is] an adequate and independent state ground justifying foreclosure of constitutional claims" in habeas proceedings); *see generally Coleman v. Thompson*, 501 U.S. at 729-30 ("The [independent and adequate state ground] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds.").

This court's initial obligation with regard to Frazier's ineffective assistance of counsel claim, which the Ohio courts

held was barred by *res judicata*, is to determine whether the claim is in fact procedurally defaulted. First, we must consider whether Ohio's procedural bar to Frazier's raising his constitutional claim was "firmly established and regularly followed" at the time the Ohio Court of Appeals ruled. *Ford v. Georgia*, 498 U.S. 411, 424 (1991). It clearly was. *State v. Cole*, 443 N.E.2d 169 (Ohio 1982), the case on which the Court of Common Pleas relied, and which was subsequently cited by the Ohio Court of Appeals as support for its holding on *res judicata*, is not only itself established, but relies directly upon the 1967 case of *State v. Perry*, 226 N.E.2d 104 (Ohio 1967). *State v. Perry* was cited by this court when we held that "application of *res judicata* . . . is an adequate and independent state ground for barring habeas review of constitutional claims." *Coleman v. Mitchell*, 268 F.3d at 429.

Second, we must determine whether the state's procedural rule barring review is an adequate and independent state ground sufficient to foreclose review of constitutional claims. I have already cited authority establishing that Ohio's doctrine of *res judicata* meets this requirement. *See id.*; *see also Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003) (reaffirming *Coleman v. Mitchell*'s holding that Ohio's doctrine of *res judicata* is an adequate and independent state ground).

Third, we must be sure that the last state court to rule on Frazier's claim actually disposed of that claim on a state law procedural ground.[6] *Thompson*, 501 U.S. at 734-

---

[6] While the Ohio Supreme Court was actually the last state court to rule on Frazier's collateral appeal, the Court summarily "decline[d] jurisdiction to hear the case and dismisse[d] the appeal as not involving any substantial constitutional question." J.A. at 345 (Ohio Supreme Court order). This court therefore looks to the Ohio Court of Appeals decision as the final reasoned state court decision for purposes of considering procedural default. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991) (holding that a federal court looks through an unexplained order "to the last reasoned decision," and does not assume that the unexplained order

35. "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal quotations omitted). So long as the state court does so, its finding of procedural default precludes consideration by a federal court even when the state court also analyzed the defaulted claim under federal law. *Id.* at 264 n.10. In this case, the majority uses as its tenuous springboard to launch into the merits of Frazier's ineffective assistance claim—without ever addressing whether the claim was procedurally defaulted—a patently incorrect characterization of the Ohio Court of Appeals' ruling: "Frazier's ineffective-assistance claim was rejected by the Ohio Court of Appeals on the basis of the first prong of *Strickland*." Supra, at 19. In fact, as I discussed above, the Ohio Court of Appeals held that "the trial court properly applied the doctrine of *res judicata*." *Frazier*, 1997 WL 764810, at *6. That court never mentioned *Strickland* or any other federal court precedents pertaining to ineffective assistance of counsel (with the exception of one—*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995)—upon which Frazier relied but that contained facts "inapposite" to those of the present case). Even if the Ohio Court of Appeals had analyzed the merits of Frazier's ineffective assistance claim, its distinct holding based upon the state law doctrine of *res judicata* is sufficient to bar our consideration of that claim unless Frazier can show cause and prejudice.

Finally, we must examine whether the Ohio Court of Appeals, which applied the doctrine of *res judicata* and rejected Frazier's contention that his claim was based upon evidence outside the record, actually "discuss[ed] any of that evidence, ma[d]e specific factual findings on the matter, or provide[d] any reasoned analysis" to uphold its decision. *Williams v. Coyle*, 260 F.3d 684, 696 (6th Cir. 2001).

---

lifts the prior holding that the claim at issue was procedurally barred).

"Without such analysis, we are unwilling to rule that the claim is procedurally barred." *Id.* In this case, the Ohio Court of Appeals discussed the "new" evidence put forth by Frazier, including the affidavit of psychologist Sharon L. Pearson, who opined that Frazier should have been examined by a licensed psychologist as part of his mitigation defense. *Frazier*, 1997 WL 764810, at *6. Moreover, the court explained—in the portion of its opinion that the majority confuses for a *Strickland* analysis—the basis for its conclusion that Frazier's trial counsel were aware of Frazier's head injury and therefore why the evidence *dehors* the record was not sufficient to overcome the procedural bar of *res judicata*. *Id.* The Ohio Court of Appeals' analysis was more than sufficient to comply with the requirements of *Williams v. Coyle*.

Therefore, this court is required to determine whether Frazier can show both cause and prejudice for his failure to comply with Ohio's procedural rule. Clearly, he cannot. Frazier has not shown any cause for his failure to raise on direct appeal his claim of ineffective assistance of counsel. In his brief before this court, he fails to address the issue of procedural default at all, and instead launches directly into a discussion of the merits of his claim. "We . . . require a prisoner to demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Frazier has not even attempted to make such a demonstration, and any excuse Frazier might now present for his failure to raise his ineffective assistance claim properly on direct appeal is waived. *See Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996) (citing Fed. R. App. P. 28 and noting that the court "normally decline[s] to consider issues not raised in the appellant's opening briefs").

The one means by which Frazier could bypass the requirement that he show cause is extraordinary: "where a constitutional violation has probably resulted in the

conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). The present issue concerns whether Frazier was sentenced fairly, and so "the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). Since Frazier only claims that the alleged ineffective assistance of his counsel resulted in a failure to present available mitigating evidence at the sentencing phase, and since the evidence of his brain impairment does not call into question the jury's finding of aggravating factors, Frazier cannot use the doctrine of "actual innocence of the death penalty" to excuse his procedural default. *Id.* Moreover, since Frazier does not set forth any evidence which, if believed, might lead a trier of fact to find him innocent of the murder of Tiffany Skiba, he cannot meet *Carrier*'s actual innocence standard, namely, that the alleged constitutional error probably resulted in the conviction of a defendant who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322-27 (1995).

### III

All means of circumventing the Ohio courts' holding that Frazier's ineffective assistance claim was barred by *res judicata* have been foreclosed; this court therefore has no legal authority to consider the merits of that claim. In so doing, the majority contravenes clearly established precedent of the United States Supreme Court and this Circuit, and "undermine[s] the State's interest in enforcing its laws." *Coleman v. Thompson*, 501 U.S. at 731. I therefore dissent.