BOYCE P. MARTIN, JR., Circuit Judge,
dissenting.
Nicholas Sutton’s childhood was horrific. The undisputed facts elicited at his habeas hearing in the district court from a licensed clinical psychologist who had evaluated Sutton, Dr. Gillian Blair, showed “an unstable, often violent and threatening home life where the supervision and structure were inadequate.” His brutal, mentally-ill father held Sutton and his mother at gun point during a stand-off with the police. When Sutton’s father later died of hypothermia and exposure while Sutton was a child, the death was never explained to him. Sutton was also abandoned by his mother before the age of one and by his maternal grandparents at the age of two. His paternal grandfather died when Sutton was only seven or eight and he was raised *768 by his paternal grandmother alone. He was shot in the eye at the age of nine, suffered several head injuries during his teenage years and was shot in the knee at sixteen. By the time he was an adolescent, he used a “wide variety of drugs” and sold drugs to earn money. He was sent to live with his aunt and uncle in Knoxville for high school because of his juvenile problems and drug abuse, but his lack of an education was not addressed, and he dropped out of high school during the eleventh grade. Though he joined the Navy at the age of seventeen, he was unable to adjust to military life because he was overwhelmed by the training and could not cope with the emotional pressure. Shortly after enlisting, Sutton received an honorable discharge. Dr. Blair diagnosed Sutton with Axis II personality disorder.
Sutton’s trial counsel did not present any of this evidence at the penalty phase of Sutton’s trial — not because he made a tactical trial strategy decision that the evidence would be unhelpful or would, as the state courts mused, potentially open the door to introduction of other damaging evidence, but because trial counsel simply did not deign to ask his client. A thorough inquiry into a client’s childhood and background is high on an attorney’s list of things to do when defending a capital case, along with “show up,” “wear a suit,” and “stay awake.” Sutton’s counsel’s failure to make this basic inquiry constitutes ineffective assistance of counsel per se. See Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (due to minimal investigation, counsel presented no evidence of defendant’s family history, which included severe childhood abuse); Hamblin v. Mitchell, 354 F.3d 482 (6th Cir.2003) (counsel failed to seek mitigating evidence and thus did not learn of defendant’s unpleasant childhood); Frazier v. Huffman, 343 F.3d 780 (6th Cir.2003) (counsel presented no mitigating evidence except defendant’s one-sentence statement).
Thus, I turn to the second Strickland prong, whether counsel’s deficient performance prejudiced Sutton. Stated differently, had counsel introduced evidence of Sutton’s troubled upbringing and argued the evidence in mitigation of imposition of the death penalty, is it reasonably possible that the jury would have imposed life in prison instead of lethal injection? I believe so. As the Supreme Court observed in Williams v. Taylor, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000): “Mitigating evidence unrelated to dangerousness may alter the jury’s selection of penalty, even if it does not undermine ... the prosecution’s death-eligibility case.” In Williams, the Court recognized that “the reality that [the defendant] was ‘borderline mentally retarded[ ]’ might well have influenced the jury’s appraisal of his moral culpability.” Id.
The same is true here. Had the jurors been confronted with the mitigating evidence of Sutton’s extremely troubled childhood, the probability that at least one juror would not have decided that the aggravating circumstances of the case outweighed the mitigating circumstances beyond a reasonable doubt “is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052; see also Wiggins, 539 U.S. at 535, 123 S.Ct. 2527 (“Had the jury been able to place petitioner’s excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.”); Frazier, 343 F.3d at 798-99; cf. Tenn.Code Ann. § 39-13-204(i) (providing that “[n]o death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the *769 existence of one (1) or more of the statutory aggravating circumstances”).[1] And, because I believe that it is reasonably possible that the jurors would not have unanimously agreed to impose the death penalty upon Sutton had they heard all of the evidence, I would find that the violation of Sutton’s right to effective assistance of counsel at the penalty phase of his trial was prejudicial, and that the state court’s conclusion to the contrary is an unreasonable application of clearly established Supreme Court precedent. I would, therefore, remand this case for resentencing so Sutton may present evidence of his upbringing to a jury, or at least receive competent advice of counsel as to whether to present the evidence. Cf., e.g., Wiggins, 539 U.S. at 534, 123 S.Ct. 2527; Hamblin, 354 F.3d at 494; Frazier, 343 F.3d at 798.
The majority, of course, disagrees. It attempts to reconstruct the sentencing phase and jury deliberations, assuming the introduction of Sutton’s appalling childhood and background and speculatively admissible evidence of Sutton’s prior crimes, to show that Sutton was not prejudiced by his counsel’s deficient performance. To accomplish this feat, the majority employs an impressively sterile, faux-mathematical dissection that, as best I can follow, involves subtracting an ethereal “net mitigating value” of this evidence from the aggravating circumstances and dividing by the square root of maybe. After performing this devil’s arithmetic,[2] the majority concludes that Sutton was not prejudiced.
Now, I fully believe that judges are ordinarily good at looking back to determine when an error in a trial court was prejudicial to the outcome, at least with a greater likelihood of accuracy than a layman. And I fully concede that for our appellate and collateral review systems to work, our better-than-average accuracy rate is sufficient for most cases. The fact remains, however, that an appointment to the federal bench affords judges a black robe, not a crystal ball. Capital cases, and especially the sentencing phase of capital cases, are not “most cases” and better than average just will not do to accomplish Strickland’s overarching goal of ensuring confidence in the outcome when the penalty for getting it wrong is the ultimate price.[3]
*770 The majority’s analysis on this point reveals just how inadequate our look-back abilities are in death penalty sentencing cases. Its attempt to recreate what would have happened during the penalty phase and then what would have happened during jury deliberations is certainly plausible, but not utterly convincing. One could easily imagine things unfolding much differently had the evidence of Sutton’s upbringing been introduced: Defense counsel introduces evidence of Sutton’s terrible upbringing — his constantly changing home life, a violent, mentally unstable father, having been shot at least twice before the age of eighteen, several head injuries, extensive drug use during his teens, and any other evidence a diligent investigation uncovers — and brings in a psychiatrist to testify as to how these childhood experiences contributed to Sutton’s violent tendencies as an adult. Even if this opened the door to allow the prosecutor to elicit testimony about Sutton’s past crimes (which the majority concedes is an unlikely possibility), including beating his grandmother to death after she found out that Sutton had killed two other people, defense counsel could plausibly have argued that Sutton’s violent nature derives entirely from his horrific childhood. In other words, both his prior violence and the instant murder stem from the same rotted roots. Moreover, the evidence suggests, and counsel could have argued, that Sutton has tried to better himself. He tried to join the Navy, but could not adjust to the emotional pressure of the training, no doubt due to his early years, and successfully obtained his GED while in prison.
Would this line of argument have changed the minds of all twelve jurors? I cannot say for certain, but in this case Sutton only needed one: If one juror had been affected by the story of Sutton’s past, Sutton would not have been sentenced to death.[4]
Furthermore, because this background information appeals to the emotions of the jurors and at least tries to paint a picture of Sutton as a human being, it strikes me as a more persuasive prediction of jury deliberations than the majority’s effort to analogize capital sentencing jury deliberations to impassive algebraic gymnastics. As an attempt to persuade the reader that Sutton suffered no prejudice, the majority’s macabre mathematics do not recognize how emotional the decision between life and death is for a juror, and for that reason fails. The decision whether to sentence someone to death is highly emotional. This is a matter of common sense, and it is well supported by the literature. See, e.g., Scott E. Sundby, A Life and Death Decision: A Jury Weighs the Death Penalty 177 (2005) (“However one feels about the death penalty, the jurors’ stories lead to one indisputable conclusion: At bottom, a jury’s effort to decide between life and death is a distinctly human endeavor infused with emotion and moral judgment. Despite the efforts of legislatures and courts to make the death penalty decision a legal judgment that is reached by following a series of rules, in the end the determination of whether the defendant lives or dies results unavoidably from the intersection of twelve jurors’ individual beliefs and views.”);[5] Terry Maroney, Emotional *771 Common Sense as Common Law, 62 Van. L.Rev. 851, 913 (2009) (noting that the Supreme “Court can openly defend its judgments about emotion as normative ones ... where there is general consensus on the nature and prevalence of the emotional phenomenon but disagreement on the weight it should be accorded in the jurisprudential calculus”). It stands to reason that at least one juror would have had a much harder time making the emotional leap to condemn a man to die had he or she known who Sutton was and how he became the man that he or she had just convicted of murder.
As I said, though I believe it to be the case, I cannot say for certain that my attempt to reconstruct events is more accurate than the majority’s. Nor can the majority honestly say that its reconstruction is more likely accurate than mine. However, one thing is certain — counsel’s failure to obtain and present to the jury evidence regarding Sutton’s awful early life robbed Sutton of his clearly established right to show himself as a human being in the jury’s eyes and made easier what should be the most difficult decision a jury can make. This is precisely the potential to undermine confidence in the outcome that Strickland stands to protect defendants and the courts against. I would therefore reverse and remand for resentencing with competent defense counsel.

. This case is substantially different from that of Carter v. Mitchell, 443 F.3d 517 (6th Cir.2006), in which this Court found that the proposed troubled-background evidence that the defendant’s counsel had gathered would not have altered the outcome because it presented a picture of a "relatively stable background.” Sutton’s background presents a picture of a young boy surrounded by chaos, a lack of stability and a lack of safety instead of the family, friends and a home that we would want for any child.

. In The Devil’s Arithmetic, a novel about a young girl transported from present-day New Jersey to a concentration camp, the camp officers use a Kafkaian system to determine which prisoners will be selected for "processing” and which will survive for another day to distance themselves from their actions in making life and death decisions for the prisoners. Jane Yolen, The Devil’s Arithmetic (1988).

. Additionally, I should note that the majority addresses several other issues of constitutionally ineffective assistance of counsel, including those of failure to raise objections to the conspicuous trial security and to statements in the prosecutor's closing arguments and that the penalty-phase jury instructions were unconstitutionally vague. Though the majority concedes that counsel’s assistance on these issues was constitutionally ineffective, it finds no prejudice. However I do not address these additional instances of ineffective assistance in depth in this dissent — because even one instance of ineffective assistance of counsel combined with a likelihood of prejudice at the penalty phase requires that the evidence go back to the jury — except to note that a capital trial marred with no less than four instances of ineffective assistance cannot pos *770 sibly leave one confident in the outcome or the appearance of justice.

. The effectiveness of mitigating evidence in persuading jurors not to impose the death penalty and, in some situations, prosecutors not to pursue the death penalty cannot be overstated. For a recent profile addressing these issues see Jeffrey Toobin, The Mitigator, The New Yorker, May 9, 2011, at 32.

. In his book, Professor Sundby synthesizes interviews with numerous capital jurors. The jurors provide a first-hand account of the *771 inner workings of jury deliberations, both on a group level and on the individual level. Comparing the accounts of these jurors with judicial attempts to recreate capital sentencing deliberations permits no conclusion but that these judicial efforts are pure fiction.